## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-1011

PAUL P. NELSON,

Plaintiff

v.

LOUIS DEJOY, Postmaster General,
United States Postal Service,

Defendant.

## COMPLAINT AND JURY DEMAND

COMES NOW the Plaintiff, Paul P. Nelson ("Plaintiff"), by and through his attorneys, Miller & Law, PC, and for his Complaint and Jury Demand against the Defendant, Louis DeJoy, Postmaster General, United States Postal Service, states as follows:

## NATURE OF THE ACTION

This action is brought to redress the Defendant's violation of the Rehabilitation Act of 1973, 29 U.S.C. §701, *et seq.* (the "Rehabilitation Act")*,* and under section 504, 29 U.S.C. §794, in particular.  Specifically, Plaintiff alleges that, in violation of the Rehabilitation Act, Defendant engaged in unlawful employment practices on the basis of Plaintiff's African-American race and his disability.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343 and the Rehabilitation Act, §§504 and 505, 29 U.S.C. §§794 and 794a. The unlawful employment practices alleged herein were committed within the jurisdictional boundaries of the United States

District Court for the District of Colorado and venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## ADMINISTRATIVE PREREQUISTIES

2.     To the extent that there were applicable procedural prerequisites for bringing Rehabilitation Act claims, Plaintiff complied with any such prerequisites for bringing this lawsuit before commencing the instant litigation.

3.     On August 27, 2016 Plaintiff timely filed a charge of employment discrimination with the United States Postal Service, following which he timely appealed the decision to the United States Equal Employment Opportunity Commission ("EEOC").

4.     By final notice dated January 12, 2021, Plaintiff was issued a Notice of Right to Sue by the EEOC.

5.     This Complaint has been filed within 90 days of Plaintiff's receipt of the EEOC's Right-to-Sue Notice.

## PARTIES

6.     Plaintiff Paul P. Nelson ("Mr. Nelson") is an individual resident of Colorado with a residential address of 5077 Weaver Drive, Colorado Springs, CO 80922-2339.

7.     Defendant Louis DeJoy is the Postmaster General of the United States Postal Service ("USPS"), a federal agency of the United States Government.  The USPS employs more than 500 employees.

## GENERAL ALLEGATIONS

8.     Mr. Nelson is African-American.

9.     Mr. Nelson suffers from a disability in the form of Post-Traumatic Stress Disorder

("PTSD"), stemming from his service in the United States Army.

10.      Mr. Nelson was hired at the USPS in April 1994.

11.      Mr. Nelson held the position of Letter Carrier at the USPS's North End Station located in Colorado Springs, Colorado (the "Station").

12.      During his employment with the USPS, of the approximately 40 employees who worked at the Station, Mr. Nelson was one of only three (3) African-American employees.

13.      Mr. Nelson had worked for the USPS for 23 years as of August 8, 2016.

14.      On August 8, 2016 Mr. Nelson arrived at the Station at 7:32 am.

15.      Almost immediately following his arrival at the Station, Mr. Nelson was addressed in a rude and offensive manner by a large Caucasian Manager who was later identified as Richard D. Hendrix ("Mr. Hendrix").

16.      Mr. Hendrix is approximately 6 feet, 2 inches tall.

17.      Mr. Hendrix is approximately 8 inches taller than Mr. Nelson, who is 5 feet, 6 inches tall.

18.      Mr. Hendrix, who was visiting the Station on August 8, 2016 as part of a Kaisen project, was conducting a stand-up meeting with the carriers at the Station that morning.

19.      Mr. Hendrix, who had not introduced himself to the group, was observed by no fewer than nine postal carriers to have been acting in a shockingly unprofessional manner during the August 8 meeting.

20.      According to other postal carriers, Mr. Hendrix's behavior during the stand-up meeting was loud, disrespectful, agitated, aggressive (both in his tone of voice and his physical demeanor), bullying, belittling and highly confrontational.

21.     According to other postal carriers, Mr. Hendrix was acting in a hostile and threatening manner during the stand-up meeting, and multiple carriers reported to the USPS that they had been made to feel intimidated and afraid of Mr. Hendrix that morning.

22.     Mr. Hendrix began swearing at Mr. Nelson as soon as Mr. Nelson entered the Station floor on August 8, 2016.

23.     Mr. Hendrix yelled to Mr. Nelson, "you need to get the hell over here!"

24.     Mr. Nelson, who did not know who Mr. Hendrix was and had not been informed of Mr. Hendrix's position with the USPS, asked Mr. Hendrix who he was, and that he show the group some respect.

25.     Mr. Hendrix erupted, and as the group watched in horror, Mr. Hendrix aggressively approached Mr. Nelson, yelling, "I am talking! Shut your mouth when I am talking!"

26.     Mr. Hendrix charged at Mr. Nelson and ordered him to get into the manager's office.

27.     Fearing for his safety, Mr. Nelson declined to go into the manager's office without his union steward being present.

28.     Mr. Hendrix went to a nearby supervisor's desk close to where Mr. Nelson was starting his work and picked up a phone.

29.     Mr. Hendrix then dialed 911 as he stood approximately 10 feet from Mr. Nelson, menacingly hovering over him; the call was placed at 7:41 am, within nine minutes of Mr. Nelson's arrival at the Station.

30.     As he was dialing 911, Mr. Hendrix smugly remarked to Mr. Nelson that he was "going to laugh when they haul you out in cuffs."

31.     Mr. Hendrix proceeded to make a series of false statements to the 911 dispatcher, after Mr. Nelson had calmly begun starting his work for the day.

32.     After identifying himself to the 911 dispatcher as the "Station Manager," Mr. Hendrix falsely reported: "I have a disruptive employee on the floor who is cursing, being loud, not following instructions and becoming threatening. I need an escort out of this building."

33.     Mr. Hendrix falsely asserted to the 911 dispatcher that Mr. Nelson had made verbal threats that were "almost physical" in nature.

34.     Mr. Hendrix described the "disruptive employee" – whose name he did not know – as "a Black male about 5 foot 8."

35.     Without prompting, Mr. Hendrix speculated to the 911 dispatcher that this Black employee might be "high" or "on drugs," asserting that this was not "normal behavior."

36.     When asked by the 911 dispatcher whether there were any weapons involved, Mr. Hendrix responded "not yet."

37.     When asked by the 911 dispatcher whether anyone was in any immediate danger, Mr. Hendrix responded "could be, I don't know. He is out of hand."

38.     When asked by the 911 dispatcher whether he and others at the scene were safe at that moment, Mr. Hendrix responded "that's why I am calling you, I don't believe we are."

39.     When asked whether anyone needed medical attention, Mr. Hendrix responded "not yet."

40.     When the 911 dispatcher asked Mr. Hendrix whether they could get themselves to a safe spot, he responded that they could go wait for the police in the break room, where they would be safe.

41.     Mr. Hendrix did not inform the 911 dispatcher that he had elected to place the call from a phone that was less than 10 feet away from where Mr. Nelson was starting his work, or that Mr. Hendrix was continuing to hover around Mr. Nelson during the call, or that Mr. Hendrix planned to laugh when the police hauled Mr. Nelson out of the Station in handcuffs.

42.     Approximately 18 minutes later - at 8:03 am - Mr. Hendrix called 911 again, to falsely report that the employee had "calmed down quite a bit" in the wake of the first 911 call, after being informed that the police were on their way to the Station.

43.     Mr. Nelson in fact had remained perfectly calm throughout that morning.

44.     Three large Colorado Springs Police officers then arrived at the Station and proceeded to question Mr. Nelson.

45.     It was the first time in at least 14 years that the police had been summoned to the Station.

46.     Mr. Nelson immediately began suffering emotional distress upon seeing the police officers and as a result of Mr. Hendrix's aggression, hostility and abuse, all of which triggered Mr. Nelson's PTSD.

47.     As it turned out, no arrests were made, and no charges were filed in connection with the 911 calls that Mr. Hendrix placed on August 8, 2016.

48.     Mr. Hendrix later made numerous sworn factual statements regarding the August 8, 2016 exchange that were at odds with the carriers' accounts of events, as well as with statements that he made to the 911 dispatcher; these discrepancies included:

a.   Mr. Hendrix's false claim that Mr. Nelson's first words to him that morning were, "fuck you. I don't work for you. Who the hell are you? It doesn't matter who the fuck you are, 'cause I don't work for you, anyway."

b.  Mr. Hendrix's new and false claim that Mr. Nelson then became aggressive and charged toward Mr. Hendrix "with an object held in his hand (Pen I believe) in the fashion as if to stab me."

c.  Mr. Hendrix's new and false claim that he directed Mr. Nelson "to stop coming towards me", to stop his behavior and join the service talk.

d.  Mr. Hendrix's false and vague claim that Mr. Nelson made multiple threats to him that "insinuated violence."

e.  Mr. Hendrix's false claim that Mr. Nelson then became irate and began swearing at Mr. Hendrix. Mr. Hendrix's false claim that it was Mr. Nelson who "completely disrupted the workroom floor."

f.  Mr. Hendrix's false claim that he warned Mr. Nelson that if he continued his "appalling behavior" and refused to calm down, then Mr. Nelson would have to exit the building.

g.  Mr. Hendrix's false claim that Mr. Nelson continued swearing even more loudly at Mr. Hendrix, and with a very aggressive demeanor, telling Mr. Hendrix to go fuck himself.

h.  Mr. Hendrix's false claim that he ordered Mr. Nelson to exit the building;

i.  Mr. Hendrix's false claim that he explained to Mr. Nelson the consequences of not following a direct order; and

j.  Mr. Hendrix's false claim that when Mr. Nelson refused to comply with his instructions, it was at that point that Mr. Nelson contacted the police for assistance with this "unruly carrier."

49.  Shortly after the police left the Station on August 8, 2016, Mr. Nelson – still shaken from the encounter - called his doctor in front of Mercedes Starling (Distribution Operations Supervisor) to schedule an appointment for the following day; he requested that he be allowed to take sick leave for August 9, 2016 in order to accommodate his disability.

50.  When Mr. Nelson returned to the Station following the completion of his postal route on August 8, 2016, Customer Service Supervisor Darryl M. Parrott ("Supervisor Parrott") and Supervisor Lisa Johnson ("Supervisor Johnson"), both of whom are Caucasian, informed Mr. Nelson that they had denied his request for sick leave.

51.     On August 9, 2016 the Station – through Mr. Parrott - placed Mr. Nelson on off-duty status and required him to undergo a psychiatric evaluation and receive approval from the USPS medical staff before he would be allowed to return to work.

52.     The Station's management also changed the code on the employee entrance to the building, to prevent Mr. Nelson from being able to access that entrance.

53.     The USPS subsequently falsely claimed that Mr. Nelson had made threatening comments to three different members of management.

54.     Based on this false claim, the USPS maintained that the alleged threats afforded it the right to request a medical evaluation of Mr. Nelson.

55.     The USPS falsely maintained that it needed to determine whether Mr. Nelson could perform the essential functions of his position and whether he posed a direct threat to himself and other employees.

56.     The USPS later maintained, based on correspondence from Mr. Nelson's doctor in support of his request to take medical leave, that Mr. Nelson was unable to return to work because of "mental health issues."

57.     Mr. Nelson's unpaid leave extended from August 9, 2016 through January 9, 2017.

58.     On January 9, 2017, Mr. Nelson returned to work at the invitation of the USPS.

59.     The USPS did not require Mr. Nelson to present any further medical documentation before allowing him to return to work.

60.     During his employment, the Station routinely treated Mr. Nelson and other African-American employees in a disparate fashion than their non-African-American counterparts.

61.     The Station's egregious, deliberate and blatant mistreatment of Mr. Nelson and

other African-American employees is reflective of the mistreatment that generally has been afforded to African-American employees by the USPS throughout its system.

62.     The Station regularly extended leniency and forgiveness to non-African-American employees in disciplinary matters.

63.     The USPS refused to take any disciplinary action against Mr. Hendrix in connection with his actions on the morning of August 8, 2016.

64.     The disparate nature of Defendant's mistreatment of Mr. Nelson in connection with the events of August 8, 2016 is reflected in its failure to take any disciplinary action against Mr. Hendrix in connection with those events.

65.     The disparate nature of Defendant's mistreatment of Mr. Nelson in connection with the events of August 8, 2016 is reflected in its handling of other incidents involving Caucasian employees at the Station, including a female Clerk who engaged in a direct, heated confrontation with Supervisor Parrott and yet was not placed on off-duty status or required to complete a psychiatric examination before she was allowed to continue working following the incident.

66.     Upon information and belief, Mr. Hendrix's actions toward Mr. Nelson on the morning of August 8, 2016 – including his abusive and aggressive confrontation of Mr. Nelson, his immediate resort to using the police to carry out his objectives, followed by his multiple deliberate and material misstatements to the 911 dispatcher that were intended to facilitate Mr. Nelson's arrest - were driven by racial animus.

67.     The foregoing events created a hostile work environment for Mr. Nelson that was based on his race.

68.     Upon information and belief, the actions of the Station's Management in denying

Mr. Nelson's request for leave, in placing Mr. Nelson on off-duty status and in requiring that he complete a psychiatric examination and obtain the approval of the USPS before returning to work, were driven by discriminatory intent on the basis of Mr. Nelson's race or color and/or his disability.

69. As a direct and proximate result of the foregoing events, Mr. Nelson suffered lost income and benefits (including through the denial and/or delay of promotional opportunities), and he was forced to expend accrued PTO and vacation.

70. As a direct and proximate result of the foregoing events, Mr. Nelson suffered severe emotional distress and humiliation, including damage to his reputation, and is still suffering emotional distress relating to these events to this day.

## CLAIMS FOR RELIEF

### First Claim For Relief
### Race or Color Discrimination, in Violation of the Rehabilitation Act

71.     Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

72.     Plaintiff satisfactorily performed the functions and requirements of his job at all times relevant to this Complaint.

73.     Defendant, either directly or by and through its agents, discriminated against Plaintiff because of his race or color.

74.     Defendant is liable for the acts and/or omissions of its agents and employees, including Mr. Hendrix, Supervisor Parrott and Supervisor Johnson.

75.     During Plaintiff's employment, Defendant, and its agents, engaged in unlawful discriminatory employment practices against Plaintiff with respect to the terms and conditions of Plaintiff's employment based on his race or color.

76.     Defendant's unlawful employment practices include, without limitation, the direct perpetuation of discrimination and harassment of Plaintiff by Defendant's management, Defendant's failure to protect Plaintiff from discrimination and harassment at the hands of management, Defendant's denial of Plaintiff's request for reasonable accommodation in the form of a one-day medical leave, Defendant's disparate treatment of Plaintiff from similarly-situated colleagues, and the additional extended leave that Defendant forced Plaintiff to take, all of which denied Plaintiff equal terms and conditions of employment and otherwise adversely affected his employment status because of his race or color.

77.     Defendant's unlawful employment practices complained of in the foregoing

paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

78.     As a consequence of Defendant's illegal conduct, Plaintiff suffered, and continues to suffer, irreparable injury and damages, including but not limited to the loss of wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

<u>**Second Claim For Relief**</u>
**Violation of 42 U.S.C. §1981**

79.     Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

80.     Plaintiff is African-American and thus a member of a protected class under 42 U.S.C. §1981.

81.     Defendant, by and through the conduct of its employees and agents, unlawfully denied Plaintiff the benefits, privileges, promotional opportunities, and terms and conditions of his employment due to his race.

82.     Plaintiff performed the functions of his job competently and was qualified for his longstanding position at all relevant times.

83.     Defendant treated Plaintiff less favorably than similarly-situated Caucasian employees, as set forth *infra*.

84.     Plaintiff was subjected to adverse treatment because of his race.

85.     But for Plaintiff's African-American race, he would not have been subjected to an abusive and hostile work environment, his request for medical leave would not have been denied, he would not have been placed on off-duty status and required to take unpaid leave, and he would not have been required to remain on extended leave pending Defendant's review and approval of

a psychiatric evaluation.

86.     Defendant's asserted reasons for its actions were pretext for discrimination and illegal retaliation by Defendant and/or its agents.

87.     Defendant's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

88.     As a consequence of Defendant's illegal conduct, Plaintiff suffered, and continues to suffer, irreparable injury and damages, including but not limited to the loss of wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

<u>**Third Claim For Relief**</u>
**Disability Discrimination, in Violation of the Rehabilitation Act**

89.     Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

90.     Defendant is a covered entity for purposes of §504 of the Rehabilitation Act; as such, the Defendant is prohibited from discriminating against any "qualified individual with a disability."

91.     The ADA, at 42 U.S.C. § 12132, extends the nondiscrimination rule of Section 504 of the Rehabilitation Act to services provided by any "public entity."

92.     Plaintiff is a qualified individual with a disability, in that he has PTSD which substantially limits one or more of his major life activities and/or major bodily functions, Defendant perceives him to have a disability, he has the requisite qualifications to perform and can perform the essential functions of the job for which he was hired (with or without reasonable accommodation), and he held and desired to continue to hold his job with the Defendant.

93.    Defendant violated section 504 of the Rehabilitation Act, 29 U.S.C. §794, by placing Plaintiff on off-duty status and by requiring Plaintiff to undergo a psychiatric evaluation and receive approval from the USPS medical staff before he would be allowed to return to work, based on his actual disability, his perceived disability, or his record of impairment.

94.    Defendant's discriminatory actions included, but were not limited to: (i) placing Plaintiff on off-duty status and forcing him to take unpaid leave as a result of his disability, (ii) limiting, segregating, or classifying Plaintiff in a way that adversely affected his opportunities or status because of his disability; (iii) utilizing standards, criteria, or methods of administration that had the effect of discrimination on the basis of disability; (iv) failing to make reasonable accommodations for the known limitations of Plaintiff, an otherwise qualified individual employee with a disability, despite the fact that doing so would not have imposed an undue hardship on the operation of the Defendant's business; and/or (v) denying employment opportunities to Plaintiff based on the Defendant's need to make reasonable accommodations for his impairments.

95.    Defendant's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

96.    As a consequence of the Defendant's discrimination, Plaintiff suffered, and continues to suffer, irreparable injury and damages, including but not limited to the loss of wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor

and against the Defendant, and award him the following relief, to the fullest extent allowed by law:

i.   Actual monetary damages for all injuries suffered by Plaintiff in an amount to be determined at trial, including but not limited to, damages for lost wages and employment benefits;

ii.  Compensatory and/or punitive damages on all claims allowed by law and in an amount to be determined at trial;

iii. Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

iv.  Pre- and post-judgment interest at the highest lawful rate; and

v.   Any further relief that this court deems just and proper, and any other relief as allowed by law.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 12th day of April 2021.

MILLER AND LAW, P.C.

By: /s/ David J. Meretta_____
(303) 722-9270 fax
djm@millerandlaw.com